**WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,**

**v.**

**TITANIUM METALS CORPORATION OF AMERICA, Defendant.**

**Civ. A. No. 792.**

United States District Court
D. Nevada.

Oct. 1, 1969.

D.C. Nov. 10, 1969, 305 F.Supp. 1032; People v. Belous, Cal., 80 Cal.Rptr. 354, 458 P.2d 194 (1969).

W. Bruce Beckley, Las Vegas, Nev., and Edward F. McKie, Jr., and Irons, Birch, Swindler & McKie, Washington, D. C., and Fred Shapoe, Pittsburgh, Pa., for plaintiff.

Herbert M. Jones, Las Vegas, Nev., and Ward, McElhannon, Brooks & Fitzpatrick, New York City, for defendant.

FINDINGS OF FACT

ROGER D. FOLEY, Chief Judge.

1. This is an action for patent infringement brought by the plaintiff, Westinghouse Electric Corporation, against defendant, Titanium Metals Corporation of America, for infringement of United States Patent 3,072,982 which issued in the names of the applicants, Robert B. Gordon and Walter J. Hurford, on January 15, 1963.

2. Plaintiff is a Pennsylvania Corporation having its principal offices in Pittsburgh, Pennsylvania, while defendant is a Delaware Corporation having a regular and established place of business at Henderson, Nevada, in this judicial district, where it has performed the process accused of infringement within the six-year period preceding the filing of the complaint herein on June 17, 1965.

3. United States Patent 3,072,982 embraces an alleged invention resulting from performance under a Government contract with the Atomic Energy Commission. The United States Government enjoys a royalty-free license under the patent in suit. Defendant incurs no liability under this patent for any operations conducted on behalf of the United States Government.

4. Shortly after issuance of the patent in suit, plaintiff offered defendant a license under the patent, but such offer was refused.

5. U. S. Patent 3,072,982 was issued by the U. S. Patent Office following a decision favorable to patentability of the claims by the United States Court of Customs and Patent Appeals, Application of Gordon, 1962, 302 F.2d 749, 49 CCPA 1086. The alleged invention of the '982 patent involves the concept of preparing a first arc-cast ingot of a reactive metal such as zirconium, titanium, tantalum, uranium or the like and, without intermediate fabrication of such ingot, remelting it as a consumable electrode to produce a second ingot. Such process broadly is recited in claim 6:

"6. In the process of preparing a clean, sound and highly homogeneous ingot of a metal from a first arc-cast ingot having a thick contaminated surface and lacking homogeneity and soundness, the step comprising employing the solid arc-cast first ingot as an electrode and arc melting the first ingot alone in a cooled mold, the mold forming the other electrode, the arc-melting being carried out under vacuum, whereby such arc-melting deposits only the metal from the first ingot into said mold and produces therein a clean surfaced ingot which is sound and highly homogeneous."

The ingot resulting is generally characterized by enhanced homogeneity, soundness and cleanness as compared to the first-melt ingot as produced in processes practiced by the prior art.

## HISTORICAL BACKGROUND

6. Shortly after World War II, the United States Navy began the development of atomic reactors to power naval vessels. In 1948, the AEC entered into a contract with plaintiff to design and furnish a prototype of the desired nuclear reactor. Plaintiff operated a Government-owned facility called Westinghouse Atomic Power Division (WAPD). Pursuant to this and a subsequent Government contract, propulsion plants for the Navy's atomic submarines were developed and installed by Westinghouse.

7. Early in the consideration of the shipboard atomic reactor, zirconium was chosen as the structural metal to be employed in view of its high melting point, corrosion resistance in a hot water environment, and low nuclear cross section. These characteristics are prerequisite to an atomic reactor of the type proposed.

8. As of 1949, zirconium was, for the most part, a laboratory curiosity which had been produced in small quantity and used principally as a gettering agent in incandescent lamps or vacuum tubes. A process for the production of sponge zirconium was developed by Kroll, an employee of the Bureau of Mines and, until the mid 50's, the Bureau remained the single quantity producer of sponge zirconium metal.

9. Zirconium sponge, due to its method of production, was and is contaminated with volatile materials, principally magnesium and magnesium chloride. Since, at the time, only pure zirconium metal was believed to possess requisite corrosion resistance in extended hot water environment, the prototype or Mark I reactor designed, constructed and installed by plaintiff at an Idaho test site during 1950–51 was made from "crystal bar" zirconium. This material is a highly pure zirconium produced from zirconium sponge by a tedious and expensive purification process.

10. WAPD manufactured crystal bar zirconium from sponge for construction of the successful Mark I prototype reactor. More than twenty tons of crystal bar were melted in tungsten-tipped, nonconsumable electrode furnaces to produce ingots about 4 inches in diameter and 12 inches long. These ingots then were fabricated into the structural shapes necessary to construct the Mark I reactor.

11. Fuel elements of the atomic reactor comprised an alloy of zirconium and a small proportion of uranium. In order to be acceptable, the fuel elements required a uniform distribution of the uranium in the zirconium, i. e., alloy homogeneity.

12. During work on the Mark I reactor, it was determined that requisite corrosion resistance could be obtained without attenuation of the other desirable properties of zirconium, if it were alloyed with a small percentage of other elements including tin. Again, satisfactory performance in the structural elements of the reactor required alloy homogeneity. In order to satisfy the requirements for both structural and fuel elements, it was essential to develop methods for producing homogeneous, sound and clean ingots of zirconium alloy for subsequent fabrication into the desired shapes.

13. At WAPD, the homogeneity problem initially was approached by adopting a known process which involved forging and rolling the initial ingot to sheet stock. The sheet then was chopped up in pieces, admixed and remelted in a nonconsumable tungsten electrode furnace to produce a second ingot. Acceptable homogeneity was achieved but the fabrication techniques employed were both time-consuming and expensive and, in addition, were responsible for undesirable contamination of the highly reactive metal with embrittling oxygen and nitrogen.

14. The prior art taught the nonconsumable arc remelting of arc melted refractory metal 50 gram buttons, without intermediate forging or rolling, to improve the homogeneity of the metal.

15. However, the very limited depth of melting which can be achieved by this method limits its use to very small sizes,

up to 250 grams (about ½ pound), and the method is impractical for larger sizes. Moreover, without chopping into pieces before remelting, the desired degree of homogeneity was not obtainable by button remelting.

16. The published art prior to the alleged invention of the patent in suit contains no suggestion of direct consumable arc remelting of ingots of metal.

17. The prior art taught the consumable arc melting technique employed in the remelting step of the process patented by plaintiff.

18. The Patent Office was not apprised of, and did not cite, the prior art. (Hayes, et al., Kroll and Parke and Ham publications.)

### THE BUREAU OF MINES HISTORY

19. The United States Bureau of Mines had established, prior to the alleged invention, that the homogeneity and soundness of zirconium alloy ingots can be improved by fabricating the ingots into smaller shapes and remelting those shapes. In one experiment, an ingot was fabricated into bar shape and consumably remelted, while in another experiment an ingot was fabricated into chopped sheet which was nonconsumably arc remelted. Both experiments resulted in improved homogeneity and soundness, though the chopped sheet technique gave better homogeneity and soundness than the fabricated bar technique.

The Bureau of Mines thereafter identified ingots rejected as out of specification in the following manners:

B₁—suitable for remelt as formed electrode;

B₂—suitable for remelt as chopped sheet;

C —reject.

In the formed electrode technique, the 8 inch diameter first melt ingot was forged and rolled to 2 inch x 2 inch bars and those bars consumably remelted in an 8 inch crucible.

The Bureau of Mines had, for some months prior to completion of the alleged invention here in issue, been regularly remelting zirconium alloy metal by such a process, which is referred to as the "828" process, at its Albany, Oregon, station. That use was to such an extent that Bureau of Mines employees later reported having melted three tons of metal by the "828" process.

20. In the Bureau of Mines' "828" process, the metal to be remelted was not subdivided into pieces for mechanical intermixing and blending prior to remelting, as it was in the chopped sheet process referred to in finding 19 and previously performed extensively at WAPD under supervision of the alleged co-inventors of the patent in suit. The "828" process demonstrated that enough blending of the ingredients of the metal can be achieved by the forging and rolling and consumable remelting technique to result in the necessary improvement in homogeneity and soundness.

21. The "828" process did involve forging and rolling between the first and second meltings of the ingot. The testimony at the trial by persons who were employees of the Bureau of Mines at the time in question was to the effect that forging and rolling was necessary only in order to resize the first melt ingots to two-inch square electrodes to fit the feed mechanism of the Bureau's furnace, and that no improvement in homogeneity and soundness was attributed at the time to the intermediate forging and rolling operations.

22. The contemporaneous Bureau of Mines' reports did not state that the only reason for forging and rolling prior to remelting in the "828" process was to accommodate to the size of the feed mechanism of the furnace used for remelting. Rather, the reports attributed improvement in homogeneity and soundness to the operations actually performed, namely, forging and rolling, followed by remelting.

23. It was not until July 28, 1952, that the Bureau of Mines initially remelted an ingot without first forging to bar form. It was not until about August 15, 1952, that the Bureau of Mines re-

ported that they had demonstrated that the necessary improvement in homogeneity and soundness could be achieved by mere blending of the ingredients within the molten pool during the remelting process.

24. The statements in the testimony to the effect that it was known at the Bureau of Mines at the time the "828" process was practiced that the forging and rolling operations, including accompanying heating, did not contribute to improvement in homogeneity and soundness, are inconsistent with contemporaneous documents originating with the Bureau of Mines.

25. No Bureau of Mines' reports, letters nor any other evidence introduced at the trial indicate that the only reason for the Bureau of Mines to forge and roll first-melt ingots was to accommodate to the size of the feeding rolls in the furnace used to make the second-melt ingot.

26. Hurford, an expert metallurgist, testified at the trial that in 1952, before completion of the alleged invention in suit, he thought the forging and rolling in the "828" process was necessary to improve homogeneity and soundness.

27. Prior to the alleged invention here in suit, it was appreciated by those skilled in the art of melting zirconium and titanium metals and alloys, that forging and rolling prior to remelting costs time and money and inevitably resulted in contamination, i. e., the raising of the oxygen and nitrogen content of the metal which cannot thereafter be reduced to their former values by remelting.

28. In October 1951, at the outset of its zirconium alloy melting program, the Bureau of Mines confirmed, as stated in finding 19 above, that the homogeneity and soundness of this material could be improved by fabricating and consumable arc remelting of the first-melt ingots. But, since remelting costs money and takes time, the Bureau of Mines devoted considerable effort to measures designed to make satisfactory ingots with only one

melting, such as improved methods of adding tin and magnetic coil stirring techniques. Nevertheless, fabrication and remelting continued to be necessary for a large number of ingots, either at the Bureau of Mines or their destination, until after July 28, 1952.

29. During the June 15–July 15, 1952, reporting period, the Bureau of Mines had completed construction and had in operation a new consumable electrode arc furnace called Model II. At the end of that period, it was being used to produce one homogeneous and sound ingot per day from electrodes forged and rolled from ingot. During the next month, the crucible diameter reportedly was increased without undue difficulties to permit melting a 10 inch ingot, and the first one was produced on July 18, 1952. On July 26–28, 1952, using this new furnace, the Bureau of Mines successfully employed the direct double-melting technique without the intermediate fabrication, which became known as the "610" process. The evidence does not support plaintiff's contention that the Bureau of Mines may have developed the "610" process after having been informed of the success of Allegheny Ludlum in directly remelting ingots as ingots without intermediate fabrication, between July 12 and July 23, 1952. (See finding 50, infra.)

30. Knowledge of the Bureau of Mines' "828" process was communicated to a number of persons and organizations, including Westinghouse, by monthly reports.

31. The Patent Office was not apprised of the Bureau of Mines' "828" process.

32. Direct remelting without intermediate fabrication resulted in much less waste of valuable zirconium alloy, decrease in the cost of production, and reduction in contamination, while still obtaining good homogeneity and soundness.

33. The wastage, increased cost of production, and increase in product contamination incident to the forging and rolling operations in the "828" process

created a need for the alleged invention in suit over six months before it was completed.

## THE ALLEGHENY LUDLUM HISTORY

34. In late October, 1951, Hurford, the individual in charge of melting development at WAPD, visited the Bureau of Mines to discuss the problems then existing in the production of satisfactory zirconium ingots. At this time, the Bureau of Mines had performed the tests of finding 19 above, but had not yet developed its "828" technique. Upon his return, Hurford discussed the problems inherent in the various known melting processes with his superior, Gordon.

35. During this discussion, Gordon and Hurford discussed the process of the patent in suit, i. e., the direct remelting of the first-melt ingot as an ingot without intermediate fabrication. Gordon and Hurford agreed that such a process might avoid the time-consuming and contaminating intermediate fabrication step. At that time, however, they, and particularly Hurford, felt that the intermediate fabrication step was essential to obtain the necessary homogeneity and soundness.

36. In order to maintain the schedule set by AEC, and particularly Admiral Rickover, it became apparent that the facilities at the Bureau of Mines and WAPD were not adequate for large scale production of large zirconium alloy ingots of requisite homogeneity, soundness and cleanness. Accordingly, AEC and WAPD approached a number of commercial melting organizations understood to have facilities capable of producing the desired ingots in quantity. Allegheny Ludlum Steel Corporation was one of the companies approached.

37. Until 1949, Allegheny had been a specialty steel producer. At this time, a decision was made to enter into development and commercial production of titanium in view of the attractive potential of that metal for structural purposes. At the time Allegheny Ludlum was approached, it was known to have the capability of melting 12 inch titanium ingots. By early 1952, Allegheny Ludlum had melted a few zirconium ingots from sponge for the AEC, but such ingots had not been acceptable.

38. For a period of several months prior to April 8, 1952, plaintiff had itself been remelting zirconium-tin alloy ingots supplied to it by the Bureau of Mines, with the aim of improving the homogeneity and soundness thereof, by a nonconsumable electrode arc melting procedure which involved rolling the ingot into a sheet, chopping the sheet into small bits and mixing and blending the bits prior to remelting. This process was not suitable to AEC's needs for high volume, low cost production, and it was in hopes of finding a commercial source of sound, homogeneous ingots that plaintiff sought the melting assistance of Allegheny Ludlum.

39. As of April 8, 1952, Allegheny Ludlum was reputed to be skilled in consumable electrode arc melting technique, and was known to have been actively engaged for some time in the melting of titanium and titanium alloys (which are somewhat similar to zirconium and zirconium alloys insofar as melting is concerned), by means of such techniques. Allegheny Ludlum maintained its melting processes and equipment in confidence.

40. A meeting between representatives of Allegheny, AEC and WAPD was held on April 8, 1952.

41. For several months prior to April 8, 1952, both the Government and plaintiff had been seeking to enlist the aid of Allegheny Ludlum in solving their problem of producing sound and homogeneous zirconium ingots in volume and to induce Allegheny Ludlum to enter into an experimental melting program.

42. At the April 8, 1952, meeting, Allegheny Ludlum agreed to enter into an experimental melting program. Allegheny Ludlum's motives in entering into the program were threefold: First, to take advantage of the opportunity thus

afforded for research in the new material, zirconium, without cost to itself; second, the greater opportunity thereby afforded for participation in the eventual commercial supply of zirconium products for the Government's reactor program; and third, a patriotic desire to help the Government in solving a problem vital to national defense. These motives or objectives were realized, in that Allegheny Ludlum supplied in excess of 500,000 pounds of zirconium alloy products for that program.

43. Plaintiff's motives in establishing the experimental melting program were: First, to speed solution of its melting problems, and second, to establish a much needed commercial source of supply of economical zirconium products of requisite quality and quantity.

44. Prior to attending the April 8, 1952, meeting, Hurford and Gordon discussed the various melting processes then in use or under consideration with their two subordinates, Goodwin and Lorenz. During the course of this discussion, the suggestion of the direct remelting of an ingot as an ingot without intermediate fabrication (forging and rolling) was disclosed to Goodwin and Lorenz. As a result of an order by Dr. Gordon, research records were reviewed and patent disclosures submitted prior to the end of the year. On December 24, 1952, the disclosure was reviewed by and discussed with Goodwin and Lorenz who executed it as witnesses on that date and recorded the date of April 4, 1952, as the date of Hurford's initial disclosure to them.

45. The direct remelting portion of the claimed invention described by the patent in suit was first performed by Allegheny Ludlum pursuant to purchase orders from plaintiff. These orders were issued in an experimental melting program to find improved ways and means of producing sound and homogeneous zirconium alloy ingots for use in the United States Government's shipboard thermal reactor development project, of which plaintiff was principal contractor and in overall charge. Allegheny Ludlum agreed to take part in the experimental program by accepting from plaintiff and performing purchase orders for melting.

46. The experimental program referred to, supra, had its inception at the meeting of personnel of plaintiff, Allegheny Ludlum, and AEC on April 8, 1952. At this meeting, Allegheny Ludlum undertook, using its background of knowledge and experience in consumable arc titanium melting, and employing its titanium research facilities, and personnel, to melt under Westinghouse Purchase Order 21222 a series of three zirconium tin alloy ingots from zirconium sponge to be supplied by the Government. Allegheny Ludlum further agreed to sample each ingot produced and ship the samples to Mr. Hurford for homogeneity, soundness and contamination determinations. The results of these determinations were to be telephoned to Mr. Herres, then of Allegheny Ludlum, so that he could vary his melting practice on the next ingot according to the results obtained on the previous one. If the single-melted ingots did not meet the plaintiff's specifications, Allegheny Ludlum agreed to remelt the ingots. Allegheny Ludlum personnel expressed the opinion at the meeting that it should not be necessary to double-melt zirconium alloy in order to achieve the desired homogeneity and soundness.

47. At the April 8, 1952, meeting, Allegheny Ludlum agreed to accept an experimental order to remelt a number of single-melted Bureau of Mines' zirconium alloy ingots, which had failed to meet plaintiff's homogeneity and soundness specifications, in order to attempt to improve the homogeneity and soundness thereof. Allegheny was to melt one ingot, sample it, ship the samples to WAPD for analysis and then receive the results of analyses and authorization from WAPD to melt the next ingot. The analyses of the Bureau of Mines' ingots were to be shipped to Allegheny Ludlum so they could determine the best manner to remelt those ingots into homogeneous and sound ingots.

48. Finally, Allegheny Ludlum agreed at the April 8, 1952, meeting to double-melt an ingot from the relatively porous "C" grade sponge, by melting the sponge into a 12 inch diameter ingot, shipping a slice from each of the top and bottom to plaintiff, and then remelting the balance into a 12 inch diameter ingot to be held for fabrication under a separate purchase order.

49. It was agreed that Allegheny Ludlum would be paid for the melting operations to be performed, whether or not the resulting ingots were satisfactory. Under its agreement with the AEC, all of plaintiff's expenses in the submarine thermal reactor program, including this program of developing through Allegheny Ludlum a satisfactory commercial source of Zircaloy, were paid by the Commission.

50. It is not disputed that the first direct remelting of zirconium alloy ingots was the melting of certain Bureau of Mines' zirconium alloy ingots into ingots Nos. ZR 37, ZR 38, ZR 39 and ZR 40 during the period from July 12 to 23, 1952, by personnel of Allegheny Ludlum at Watervliet, New York, done in the absence of any representative of plaintiff. The ingots so melted were supplied, under purchase orders 21247 and 21339, to Westinghouse employee Hurford and various tests performed on them at Westinghouse under Hurford's supervision. The tests showed that the inhomogeneous and unsound Bureau of Mines' ingots had been changed into satisfactory homogeneous and sound ingots by the direct remelting procedure. Accordingly, the melting to form ingots Nos. ZR 37, ZR 38, ZR 39 and ZR 40 completed a successful use of the process of the patent in suit.

### EVIDENCE OF GORDON AND HURFORD CONCEPTION

51. The evidence offered by plaintiff to establish an original conception of the patented process by its patentees prior to the melting of ingots ZR 37–40 by Allegheny Ludlum, in addition to the purchase requisition (see F 59), consists of oral testimony of the patentees themselves; the patentees' patent disclosure form, dated December 24, 1952, stating the alleged invention was disclosed on April 4, 1952, to two of the patentees' subordinates Lorenz and Goodwin; the signatures of Lorenz and Goodwin; and testimony by Lorenz and Goodwin.

52. Lorenz and Goodwin both testified at the trial on behalf of plaintiff, but at the time of their testimony neither had any recollection of the April 4, 1952, disclosure referred to in F 51, supra. Nevertheless, both testified to the great importance they attached to selection of the correct date for receipt of the disclosure, and their certainty that they had received the disclosure April 4, 1952, or they would not have signed the patent disclosure document and inserted that date adjacent to their signatures. Mr. Lorenz testified that at the time of his signing the patent disclosure form, Mr. Hurford presented to him a collection of documents which they reviewed after he had read the disclosure form. He also stated that he would not have signed the patent disclosure if he had not been convinced at that time by the material in the disclosure form and the documents he had reviewed that the date April 4, 1952, was correct for the prior disclosure.

53. When they signed the patent disclosure form as "witnesses" on December 24, 1952, both Lorenz and Goodwin were employees of plaintiff working directly under Hurford's supervision. Their signatures were placed on the form at Hurford's request, and either Hurford suggested the April 4, 1952, date to them or that date evolved out of a conversation with Hurford.

54. Mr. Goodwin was in close daily contact with the operations of plaintiff which involved melting by Allegheny Ludlum, continuously from the date April 4, 1952, to the date of witnessing the patent disclosure document on December 24, 1952. Mr. Lorenz also worked on the same project until Novem-

ber, 1952, and continued melting work with Hurford thereafter. Accordingly, it is not unbelievable that Goodwin and Lorenz could accurately remember both the disclosure and its date, over a period of 8½ months prior to memorializing both in the disclosure form.

55. Defendant contends that when the patent disclosure form was prepared, on December 24, 1952, the patentees believed that the process in question had been disclosed at the April 8, 1952, meeting with Allegheny Ludlum and in Hurford's minutes of that meeting and that this belief made it incumbent upon the patentees to assert a conception date prior to April 8, 1952, in order to substantiate their claim of originality.

56. The items of evidence asserted to justify this contention are (1) a memorandum of February 12, 1953, by a Mr. Van Horn, whose testimony was not taken in this action, but who attributed to Gordon a statement that the alleged invention was disclosed at the meeting in question, and (2) a reference in the transmittal form for the patent disclosure of the alleged invention to Hurford's minutes of that meeting.

It is apparent from a reading of the minutes and the patent disclosure that the alleged invention in suit was not disclosed in the minutes. Similarly, the alleged invention was not disclosed in the trip report or purchase order 21247. The reference to these items in the transmittal form states that the method was "briefly mentioned", rather than "disclosed". Whether it was strictly accurate to state that a direct remelting method, without intermediate fabrication, was "briefly mentioned" by mere mention of remelting, as was made in all reference documents, is questionable. However, Hurford explained in his testimony that the documents were merely related to the patent matter and were referenced for that reason. Hurford's explanation is logical and deemed truthful.

Gordon's pretrial deposition taken by defendant was introduced in evidence at the trial. Though he was not examined concerning the accuracy of the statement attributed to him by Mr. Van Horn, he stated that he was not willing to disclose the alleged invention in April 1952 and that the Hurford minutes of the April 8 meeting, which do not indicate the alleged invention was there disclosed, were accurate.

57. In the light of all the circumstances, there is no reason seriously to doubt the accuracy of the date April 4, 1952, disclosure of the alleged invention to Goodwin and Lorenz.

### EVIDENCE OF COMMUNICATION OF CONCEPT TO ALLEGHENY LUDLUM

58. First disclosure of the alleged invention in suit was given to Allegheny Ludlum in a telephone conversation between Hurford and Allegheny Ludlum employee Crosier between the end of June and July 3, 1952.

59. The document of earliest origin which is of record in this case which evidences the existence of the suggestion of the patented process in the mind of either Gordon or Hurford, is plaintiff's purchase requisition 73–E–21339–M, which was prepared by Hurford, and typed and approved by Dr. Gordon's supervisor on July 3, 1952.

60. Hurford decided in late June to try out the direct remelting technique without intermediate fabrication, and communicated that decision to Mr. Crosier by telephone. The date of the telephone communication was fixed by Hurford by the analysis information for ingot ZR 36 (which showed the failure of direct melting to achieve the requisite homogeneity and soundness and triggered the decision to directly remelt) and the July 3 purchase requisition 21339, which expressly mentions remelting 7½ inch diameter Bureau of Mines' ingots into 12 inch diameter ingots without fabricating them.

61. Ingot ZR 36 was melted on May 26, 1952, and samples shipped to plaintiff. The analysis information for the ingot bears a handwritten note: "Info

to AEC July 1, 1952", thereby indicating that Hurford had the information by the end of June 1952.

62. Hurford testified that he told Crosier that he had another purchase order for melting under which he wanted the ingots directly remelted as ingots without fabrication. The telephone communication was prior to the July 3, 1952, date borne by the purchase requisition, but Hurford had before him a handwritten notation containing the same direct remelting information as the requisition.

63. The 21339 purchase requisition was followed by a formal purchase order of the same number which bears an issue date of July 7, 1952, and which contains the specific statement:

> "The purpose of this order is to determine if 12″ dia. ingots can be melted from 7½″ dia. ingots without fabricating them and to determine the effect of remelting on the tin homogeneity."

This, of course, is the remelting step of the alleged invention in suit.

64. That the 21339 purchase order was communicated to Allegheny Ludlum is established:

(1) by a statement thereon: "Confirming verbal order to Mr. C. L. Crosier, 7/7/52";

(2) by a shipment notice of "L" order dated July 3, and a bill of lading shipping to Allegheny Ludlum the Bureau of Mines' ingots to be remelted on order 21339, bearing the handwritten note: "Rec. C. L. Crosier OK 7/7/52";

(3) by the Allegheny melt records for ingots ZR 38 and 39, admittedly melted under order 21339(W) and showing a first date of work on these ingots of July 9, 1952;

(4) by the shipment of ingots ZR 37 and ZR 38 to plaintiff from Allegheny on July 18, 1952;

(5) by a Crosier work status report to his superior, Mr. Pierce, identifying the 21339 order as received July 7, 1952; and

(6) by an Allegheny order copy dated August 1, 1952, showing the customer order date as of 7/7/52.

65. At some time not now precisely known, but after the first disclosure of the direct remelting method to Mr. Crosier, the latter reported to Mr. Hurford his difficulty in welding together bars forged under the 21247 purchase order to fabricate a consumable bar electrode for remelting, and Hurford authorized him to discontinue that method and use the direct remelting technique for the rest of the Bureau of Mines' ingots supplied to Allegheny under that order.

## EVIDENCE OF HERRES AND SOUTHERN CONCEPTION AND COMMUNICATION TO PLAINTIFF

66. Allegheny Ludlum's head of titanium research, Herres, testified that he had in mind the idea of remelting Bureau of Mines' zirconium alloy ingots as ingots, without intermediate forging or rolling, immediately following plaintiff's request to Allegheny for the remelting of such ingots on April 8, 1952. Herres' associate, Southern, testified that he decided to use zirconium alloy straps for welding Bureau of Mines' ingots together to form consumable electrodes for remelting, that either he or Herres ordered the straps for that purpose from plaintiff and that the straps shipped to Allegheny Ludlum pursuant to plaintiff's shipment notice of June 30, 1952, were sent in response to that order. There is no testimony that such alleged purpose for the straps was communicated to plaintiff. Defendant relies on no earlier (or other) documentary evidence than the shipment notice to substantiate its alleged conception and communication to plaintiff.

67. Allegheny Ludlum maintained and ultimately produced a chronologically complete set of reports covering its titanium melting development. These records embrace laboratory notebooks

and periodic progress reports describing melting techniques, scrap recovery, furnace development and the like.

68. The testimony of Herres and Southern that Allegheny Ludlum, and, specifically, Southern, had directly remelted titanium scrap ingots as ingots, finds no support in Allegheny Ludlum's own pertinent and chronologically complete records. A construction of defendant's Exhibit II 49 attributing to the words "remelt titanium ingots", even an intention to directly remelt scrap ingots as ingots, is inconsistent with the context of the entire record. On the other hand, construction of these words to reflect an intention to produce a second ingot by remelting scrap in the minutely described "sheathing process" is wholly consistent with the entire record.

69. The Court finds no convincing evidence that Allegheny Ludlum in fact directly remelted scrap titanium ingots as ingots. The Court believes defendant's witnesses are mistaken in their contrary recollection.

70. The four ingots referred to in F 50, supra, Nos. ZR 37–ZR 40, were arc melted from consumable electrodes formed by Allegheny Ludlum from single-melted zirconium alloy ingots joined end-to-end by means of zirconium alloy straps overlapping the joints and welded to the ingot surfaces. Similar straps were used for attaching the electrode to the ram of the furnace.

71. Prior to that melting operation, Allegheny Ludlum had received plaintiff's purchase orders Nos. 21247 and 21339, Bureau of Mines' ingots, and zirconium alloy straps, for melting under those purchase orders.

72. Plaintiff's experimental purchase order 73–R–21247–M, under which ingots ZR 37 and ZR 40 were melted, provided as follows:

"This is an experimental purchase order to remelt 1000 pounds of 7½" dia. 100 to 150 lbs. Bureau of Mines zirconium alloy ingots into 12" diameter consumable electrode arc melted ingots.

"The purpose of this purchase order is to determine if homogeneous ingots can be obtained from ingots which do not meet our homogeneity specifications by fabricating them into consumable electrodes and remelting them in your arc furnace. Analyses of the Bureau of Mines ingots will be supplied with the ingots so that you can determine the best procedure to follow in remelting them into homogeneous ingots.

"The 1000 pounds should be melted into three 12" dia. ingots which may vary from 200 to 500 pounds."

73. Throughout the trial, testimony was adduced by defendant from interested witnesses that the word "fabricate" with respect to first-melt ingots was broad and could mean "to join together". Plaintiff urged, and the documentary record supports, the obvious meaning of "fabricate" in this context as involving forging and rolling to reduce the ingot bars, sheets or particulate form for remelting. Beall, a highly knowledgeable witness the Court believes to be impartial, agreed with plaintiff. The Court finds that the meaning of "fabricate" or "fabrication", as employed in the WAPD purchase orders, is that urged by plaintiff and that defendant so understood.

74. The analyses of the Bureau of Mines' ingots were enclosed with a letter from Mr. Hurford to Mr. Herres, dated April 17, 1952, which stated:

" * * * we would like one 250 pound ingot melted from a consumable bar electrode and one 250 pound ingot from small diameter rods bundled to form an electrode. A 500 pound ingot will then be melted with whichever practice gives the more homogeneous ingot."

75. Some zirconium alloy straps to be used for assembling the consumable electrodes for ingots were shipped to Allegheny, at that firm's request, pursuant to plaintiff's shipment notice dated June 30, 1952, which, on its face, set forth the intended use of the straps as "for welding of ingots into consumable electrodes"

and which identified the purchase order in response to which this was to be done as 73–R–21247–M.

76. At about the same time as the shipment of the straps under the 21247 purchase order, Mr. Crosier, of Allegheny Ludlum, was in the process of forging and rolling Bureau of Mines' ingots to bar form for assembly into a consumable bar electrode for remelting. By reason of the steel strike then going on and affecting the Allegheny Ludlum operations, some of the forging and rolling work had to be done at the Watervliet Arsenal, a Government installation. The record indicates that such work had not been completed on July 3, 1952, when the straps were received at Allegheny Ludlum. At some unknown time thereafter, Mr. Crosier attempted to weld the two-inch-square bars into an electrode but had difficulty in so doing. Upon reporting that fact to Mr. Hurford, the latter suggested that this method of remelting be discontinued for the present.

77. The parties are in disagreement as to the significance of the request for and shipment of the zirconium alloy straps. Defendant takes the following position:

"Allegheny's request for zirconium alloy straps 'to use for welding of ingots into consumable electrodes' for remelting in response to plaintiff's experimental purchase order 73–R–21247–M, the stated purpose of which was 'to determine if homogeneous ingots can be obtained from ingots which do not meet [plaintiff's] homogeneity specification by fabricating them into consumable electrodes and remelting them', must necessarily have been preceded by a conception on the part of Allegheny's workers of the accused process itself—'preparing a first arc-cast ingot of zirconium, * * * and without intermediate fabrication (i. e., forging or rolling or chopping), remelting that ingot as a consumable electrode, to produce a second ingot.' "

78. In contrast, plaintiff takes the position:

(1) that the straps could as well have been used for the purpose of joining the two-inch-square bars together, or for joining ingots together, and that the unexplained use of the single word "ingots" in the L order is not dispositive of the matter; and

(2) that since Hurford had decided by the date of shipment of the straps to use the direct remelting method and since the instruction to directly remelt could as well have been communicated to Crosier by that date (see F. 59, supra), any interpretation of the language of the shipment notice to reflect a concept of direct remelting should be attributed to Gordon and Hurford.

79. Considering all the circumstances, including the evidence of prior suggestion by Gordon and Hurford of the direct remelting method, the shipment notice for straps under the 21247 purchase order is too equivocal to satisfactorily corroborate a suggestion of that method by Herres and Southern, or communication of that concept to plaintiff.

80. Accordingly, since the alleged conception by Herres and Southern rests on their unsupported testimony, 15 years after the events, it is not established that Allegheny Ludlum's workers conceived of the process here in issue and communicated that process to plaintiff, prior to plaintiff's receipt on or before June 30, 1952, of Allegheny Ludlum's request for zirconium alloy straps.

## COMMERCIAL SUCCESS

81. For the next several years, all zirconium ingots prepared by Allegheny Ludlum for use by WAPD in their atomic reactor program were produced by a double-melting process in which zirconium sponge was formed into compacts, the compacts were welded together to form composite electrodes and such

electrodes were melted in a first consumable arc process to form a first-melt ingot. The first-melt ingots of approximately 8 inches in diameter, without intermediate fabrication, were employed as consumable electrodes in a second melting procedure to form the final ingots 12 inches in diameter and were characterized by requisite homogeneity, soundness and cleanness.

82. Today the Gordon and Hurford process of direct double-melting of ingots, without intermediate fabrication as the means of producing sound homogeneous ingots of reactive metals, "has gone into universal use". This Court witnessed operation of such a process in defendant's Henderson plant on January 26, 1967.

## INFRINGEMENT

83. Defendant has abandoned this defense.

## CONCLUSIONS OF LAW

A. This Court has jurisdiction of both the parties and the subject matter in this action. 35 U.S.C. § 281, 28 U.S.C. §§ 1338(a) and 1400(b).

B. The patent in suit is not invalid because the alleged invention was made in this country by personnel of the Allegheny Ludlum Steel Corporation. Nor is the patent invalid because plaintiff's personnel learned of the alleged invention from Allegheny Ludlum.

C. Defendant infringes claims 1, 2, 3, 4, 5, 6, 7, 8 and 11 of the patent in suit.

D. The Bureau of Mines' "828" process in prior art as against the patent in suit.

■ E. Allowance of the patent in suit by the Patent Office without knowledge and consideration of the facts regarding the Bureau of Mines' "828" process, and without knowledge or consideration of the published prior art referred to in findings 14, 15, 16, 17 and 18, supra, deprives the patent of any presumption of validity with respect thereto.

F. The claims of the patent in suit are of such scope as to define novelty over the prior art, including the "828" process of the Bureau of Mines, and are, therefore, not invalid for lack of novelty.

■ G. But the patent in suit is invalid because the subject matter as a whole was obvious at the time the alleged invention was made to a person having ordinary skill in the art to which said subject matter pertains. That the process of the patent in suit was obvious to one skilled in the art is established in this case not only by the prior art and, in particular, the "828" process, but also by the subsequent, but almost simultaneous, independent accomplishment of the direct remelting of an ingot as an ingot without intermediate fabrication at the Bureau of Mines by the "610" process.

## ORDER

The Clerk is directed to enter judgment in favor of the defendant and against the plaintiff. Costs will be denied in view of the benefit the defendant and its parent company, Allegheny Ludlum, have had from the use of the process put into practice by Allegheny Ludlum as the result of the suggestion of plaintiff's employee, Hurford, notwithstanding the fact that the suggested process has been found to fall short of a patentable invention.